# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-01401-COA

**ROBERT EARL SANDERS A/K/A ROBERT SANDERS**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                        **APPELLEE**

DATE OF JUDGMENT:                     09/19/2024
TRIAL JUDGE:                            HON. MICHAEL M. TAYLOR
COURT FROM WHICH APPEALED:    LINCOLN COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:       OFFICE OF STATE PUBLIC DEFENDER
                                        BY: STACY L. FERRARO
ATTORNEY FOR APPELLEE:        OFFICE OF THE ATTORNEY GENERAL
                                        BY: ALEXANDRA LEBRON
DISTRICT ATTORNEY:                WILLIAM BRENDON ADAMS
NATURE OF THE CASE:              CRIMINAL - FELONY
DISPOSITION:                           AFFIRMED - 06/23/2026
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., WESTBROOKS AND WEDDLE, JJ.**

**WEDDLE, J., FOR THE COURT:**

¶1.     A Lincoln County Circuit Court jury convicted Robert Sanders of twelve counts of sexual battery against Amy.[1] For Counts 1 through 11, the Lincoln County Circuit Court sentenced Sanders to serve separate thirty-year sentences in the custody of the Mississippi Department of Corrections (MDOC). For Count 12, the circuit court sentenced Sanders to thirty years in MDOC's custody, with twenty years to serve, ten years suspended, and five years of post-release supervision. The circuit court ordered each sentence to run

---

[1] Because this case involves the sexual battery of a minor, we use a pseudonym to protect the victim's identity.

consecutively to the others. In addition, the circuit court fined Sanders $60,000 and required him to register as a sex offender.

¶2.     On appeal, Sanders argues that he was denied proper notice of the charges against him, he was subjected to double jeopardy, and the jury's verdict was against the overwhelming weight of the evidence. Finding no reversible error, we affirm Sanders's convictions and sentences.

## FACTS

¶3.     As Amy testified at Sanders's trial, she first met Sanders when she was around five or six years old. Amy's parents were going through a difficult time, and the family's pastor asked Sanders to help. Sanders helped Amy's mother, Amy, and Amy's siblings move into a trailer on his property near his home. Amy stated that at the beginning, Sanders was very welcoming and treated her family like part of his own family.

¶4.     Amy testified that eventually, however, Sanders became their pastor and began to impose rules on her family that restricted them from going to other people's homes and participating in certain social activities. Amy stated that Sanders warned her family that violating his rules would put their eternal lives at risk and would provide opportunities for Amy's father to come get them. Amy described Sanders as "mean" toward her family, and she stated that with regard to Sanders's rules for them, "[e]verything was way more complicated to be a good person."

¶5.     Amy testified that Sanders began sexually abusing her in 2012, when she was around

2

eleven years old and in the fifth grade. Amy stated that one night she and Sanders were sitting on the couch in Sanders's living room. Sanders told Amy that she had a sexual appetite and "that he was going to help [her] satisfy [her] urges." Sanders instructed Amy to "take his finger and insert it inside [her vagina]" to "pleasure herself." After inserting Sanders's finger inside her for a few seconds, Amy told Sanders she was done. Sanders, however, disagreed and said Amy was not satisfied. Sanders then told Amy that she had a future husband named Shawn and that he (Sanders) was "going to take [Shawn's] spirit and use his [(Sanders's)] penis to satisfy [her]." Amy testified that Sanders then inserted his penis inside her. Amy stated that she "was confused" by the situation but had been "brainwashed" by Sanders, whom she trusted. Based on what Sanders had told her, Amy testified that she "thought this was what was supposed to happen . . . to help [her] get [her] eternal life."

¶6.     Amy also testified that on one occasion Sanders told her that her "urges" had made her "sleep with [her] brother" and that she had become pregnant. Amy stated that neither accusation was true. Sanders told her, however, that the knowledge of what had happened would kill Amy's mother. Sanders then stated that "he could help [Amy] if [she] satisfied [her] urges [with] a different routine" and had sexual intercourse with him. Sanders also told Amy that he would "spiritually delete[]" the baby.

¶7.     Amy stated that after her first sexual encounter with Sanders, Sanders told her that such sexual encounters were "going to happen pretty often just to keep [her] urges satisfied."

3

Amy also stated that she began to receive text messages on Sanders's phone that were supposedly from her future husband, Shawn. In these text message conversations, Amy and Shawn would talk about their future together. Amy testified that during her second sexual encounter with Sanders, Sanders drove her to Lincoln Lake. Sanders asked if Amy was ready to see Shawn, and Amy said yes. Sanders then instructed Amy to move to the back seat of the car and to take off her pants. Amy stated that Sanders then inserted his penis inside her. Once Sanders had finished having sex with Amy, he drove her back to his home. Amy stated that she was still around eleven years old when this second encounter occurred. Amy testified that for the third encounter, Sanders again drove her to Lincoln Lake. They went to a bench near the bathrooms, where Sanders told Amy to lie down and remove her pants. Sanders then proceeded to have sex with Amy for the third time before driving her home.

¶8. Amy testified that Sanders also began telling her about "the reprobate order." Sanders informed Amy that if she "wasn't satisfied or wasn't getting the pleasure from him that [she was] supposed to as often as [she] was, then [she] was going to become a homosexual." As a result, Amy stated that Sanders began having sex with her "[p]retty much every weekend when [she] wasn't on [her] period." Amy testified that even when she told Sanders that she did not want to engage in their routine, he would tell her that she really did want to do so. Sanders would then take Amy "for the weekends" and have sex with her. Amy testified that the sexual abuse continued on a weekly basis for at least the next eight years.

4

¶9.    After refreshing her recollection from a document that the State handed her, Amy testified about an encounter that had occurred in December 2019, a few days before she turned eighteen years old. Amy stated that she and Sanders were inside Sanders's bedroom. Sanders told her that he was going to use Shawn's spirit to have sex with Amy. Amy testified that Sanders took off her pants and inserted his finger inside her vagina. Sanders then took off his pants and performed oral sex on Amy. Sanders took a picture of the act with his phone camera. Amy testified that they then began to have sexual intercourse, and Sanders asked her to perform oral sex on him. Amy stated that she complied and performed oral sex on Sanders. Before Sanders ejaculated, he asked Amy to use her hands to stimulate his penis and then recorded the act.

¶10.    Amy testified that she moved out of her family's home in September 2021. About six months before she left, Amy told her mother about the sexual intercourse with Sanders. Amy's mother instructed Amy to record a conversation with Sanders.[2] Amy testified that on the day she made the recording, Sanders walked over to her family's home to retrieve her. As she walked with Sanders, Amy asked why she had to spend the night with and receive counseling from Sanders. Sanders told Amy that her sexual appetite started when she was very young and that no one else in her family had a sexual appetite like she did. Sanders also told Amy that she had already gotten pregnant once from having sex with her brother and that

---

[2] Over the defense's objection, the circuit court allowed the State to admit into evidence an audio recording Amy made on her phone of a conversation between her and Sanders.

she could become pregnant again. When Amy stated that she did not want to have sex with Sanders, he disagreed with her and said that she did. Sanders told Amy that they would wait until Friday, which Amy testified had been their normal routine. During the conversation, Sanders informed Amy that when she disrespected him, she also disrespected God.

¶11. Amy played the audio recording for her mother. After speaking with Sanders, Amy's mother told Amy to delete the recording. Amy testified that several months later she moved out of her family's home and reported the abuse to the Lincoln County Sheriff's Department.

¶12. Brian Boyd, who worked as an investigator with the sheriff's department, interviewed Amy about the abuse allegations. Like Amy, Boyd testified at Sanders's trial. Boyd interviewed Amy a total of three times during his fifteen-month investigation into her accusations. Boyd stated that during each interview, Amy remained consistent in recounting the events of the sexual abuse to him. During their second interview, Amy brought her cell phone with her so law enforcement could examine the device. Based on his investigation into Amy's report of sexual abuse, Boyd arrested and charged Sanders with sexual battery.

¶13. A grand jury indicted Sanders for twelve counts of sexual battery against Amy in violation of Mississippi Code Annotated section 97-3-95 (Rev. 2020). In relevant part, the indictment charged Sanders with the following:

Count 1:     between January 1, 2012, and January 1, 2013, he committed digital penetration by inserting his fingers inside the vagina of a child under the age of fourteen years old;

Count 2:     between January 1, 2012, and January 1, 2013, he committed penile penetration by inserting his penis inside the vagina of a

6

child under the age of fourteen years old;

Count 3:    between January 2, 2013, and April 30, 2013, he committed digital penetration by inserting his fingers inside the vagina of a child under the age of fourteen years old;

Count 4:    between January 2, 2013, and April 30, 2013, he committed penile penetration by inserting his penis inside the vagina of a child under the age of fourteen years old;

Count 5:    between January 3, 2013, and April 30, 2013, he committed digital penetration by inserting his fingers inside the vagina of a child under the age of fourteen years old;

Count 6:    between January 3, 2013, and April 30, 2013, he committed penile penetration by inserting his penis inside the vagina of a child under the age of fourteen years old;

Count 7:    between January 4, 2013, and April 30, 2013, he committed digital penetration by inserting his fingers inside the vagina of a child under the age of fourteen years old;

Count 8:    between January 4, 2013, and April 30, 2013, he committed penile penetration by inserting his penis inside the vagina of a child under the age of fourteen years old;

Count 9:    between December 22, 2019, and December 25, 2019, he committed digital penetration by inserting his fingers inside the vagina of a child under the age of eighteen years old, and he was a minister in a position of trust and authority;

Count 10:    between December 22, 2019, and December 25, 2019, he committed penile penetration by inserting his penis inside the vagina of a child under the age of eighteen years old, and he was a minister in a position of trust and authority;

Count 11:    between December 22, 2019, and December 25, 2019, he engaged in oral penetration by performing cunnilingus on a child under the age of eighteen years old, and he was a minister in a position of trust and authority;

7

Count 12:   between December 22, 2019, and December 25, 2019, he engaged in oral penetration by allowing a child under the age of eighteen years old to perform fellatio on him, and he was a minister in a position of trust and authority.

¶14.   Sanders moved to quash the indictment for failing to provide him with proper notice of the charges against him.  Sanders argued that the time spans included in the indictment counts were expansive and that he could not "possibly set forth an alibi defense for each and every second" of the three hundred and sixty-six days encompassed by Counts 1 and 2, the nearly four-month time frame encompassed by Counts 3-8, and the ninety-six-hour time frame encompassed by Counts 9-12.  In addition, Sanders asserted that the indictment charged multiple offenses but employed nearly identical language and time frames for each count.  According to Sanders, "the State merely drafted repetitively identical and essentially uninformative counts [in the] indictment, making no effort to narrow the dates of the separate offenses in any meaningful way, despite the alleged victim in [the] case being at an age [when] more specificity should be expected."

¶15.   The circuit court held a hearing on Sanders's motion.  After considering the parties' arguments, the circuit judge stated the following:

The Court notes that the date ranges in Counts 1 and 2 are huge, a year.  The Court also notes the age of the alleged victim at the time the offense is alleged to have occurred is young, not as young as some cases, not as old as others. The Court notes that the dates become more specific as the alleged victim ages, which is consistent I think with what our court would require and what justice requires and what common-sense experience teaches us that children are . . . capable of.  Upon reaching the majority, a person doesn't suddenly remember being ten more clearly.  The whole thing is[,] if it's not processed . . . with dates and times and months and years, which is something that's more

8

peculiar to adults than it is to small children, . . . those memories are never tied to months unless we luck out and have a holiday or something like that that makes it stand out.

So I don't find anything constitutionally deficient about Counts 1 and 2, which are the worst in terms of the date range, and I certainly find the four-month ranges to be reasonable, and then they get shorter after that.

¶16. The circuit court concluded that the indictment satisfied both constitutional requirements and the Mississippi Rules of Criminal Procedure. The circuit court also concluded that the indictment sufficiently advised Sanders of each charge against him. As a result, the circuit court denied Sanders's motion to quash.

¶17. As stated, Amy and Boyd both testified at Sanders's trial. Amy recounted the years of alleged sexual abuse by Sanders, and Boyd discussed his investigation into Amy's claims. In addition, Sanders's wife, Valerye, testified and confirmed that Amy's mother would bring Amy to her home on Friday evenings so Amy could talk to Sanders. Valerye corroborated Amy's testimony that the visits happened on a weekly basis and that Amy would sometimes stay overnight. At the time the visits occurred, Valerye testified that she slept in a separate bedroom from Sanders. Valerye further testified that she and Amy's mother would remain in the living room or kitchen while Sanders and Amy were in the bedroom. Valerye stated that she never went into the bedroom during Sanders's visits with Amy and never spoke with Sanders about the visits. Valerye further stated that she never heard or saw anything during the visits to indicate to her that something out of the ordinary was occurring.

¶18. Sanders testified in his own defense and denied the charges against him. When asked

9

why he thought Amy had made the abuse allegations against him, Sanders stated that he believed Amy hated him for strictly enforcing rules about "no drugs, no drinking, no smoking, [and] no lying." On cross-examination, Sanders admitted that he was the one speaking with Amy on the audio recording. He also admitted that Amy had sometimes spent the night in his bedroom for their sessions together. When asked why he used his bedroom for counseling sessions with Amy, Sanders replied that his bedroom had been the only space available.

¶19. Following deliberations, the jury found Sanders guilty of all twelve counts of sexual battery. For Counts 1-11, the circuit court sentenced Sanders to serve consecutive thirty-year sentences in MDOC's custody. For Count 12, the circuit court sentenced Sanders to another consecutive thirty-year term in MDOC's custody, with twenty years to serve, ten years suspended, and five years of post-release supervision. In addition, the circuit court fined Sanders $60,000 and ordered him to register as a sex offender. Sanders unsuccessfully moved for judgment notwithstanding the verdict or, alternatively, a new trial. Aggrieved, Sanders appeals.

## DISCUSSION

### I. Sufficiency of the Indictment

¶20. On appeal, Sanders renews his argument regarding the sufficiency of the indictment. According to Sanders, the time frame identified in each count was too expansive, and the language used in each count was almost identical to that contained in the other counts. He

10

alleges that as a result of these defects, the indictment failed to provide him with sufficient notice of the charges against him. We review de novo Sanders's challenge to the legal sufficiency of his indictment. *Carr v. State*, 422 So. 3d 1024, 1034 (¶44) (Miss. Ct. App. 2025). "Whether an indictment is fatally defective is an issue of law and deserves a relatively broad standard of review by this Court." *Id.* (quoting *Shoemaker v. State*, 256 So. 3d 604, 610 (¶21) (Miss. Ct. App. 2018)).

¶21. Mississippi Rule of Criminal Procedure 14.1(a)(1) provides that an indictment "shall be a plain, concise and definite written statement of the essential facts and elements constituting the offense charged and shall fully notify the defendant of the nature and cause of the accusation." MRCrP 14.1(a)(1). "The purpose of an indictment is to furnish the defendant with notice and a reasonable description of the charges against him so that he may prepare his defense." *Carr*, 422 So. 3d at 1034 (¶45) (quoting *Goff v. State*, 14 So. 3d 625, 665 (¶175) (Miss. 2009)). Mississippi caselaw establishes that "the date of the offense is not an essential element of the offense of sexual battery . . . ." *Harrison v. State*, 421 So. 3d 331, 334 (¶6) (Miss. Ct. App. 2025) (quoting *Bradshaw v. State*, 371 So. 3d 822, 830 (¶21) (Miss. Ct. App. 2023)). Thus, an indictment in a child sexual-abuse case may prove sufficient even where "a general timeframe" rather than "a specific date" is provided. *Id.* at (¶8). The important consideration is whether "the defendant is fully and fairly advised of the charge against him." *Id.* (quoting *Jenkins v. State*, 131 So. 3d 544, 549 (¶14) (Miss. 2013)).

### A. Counts 1 through 8

¶22. With regard to Counts 1-8 of his indictment, Sanders asserts that "[t]he language of each count is almost identical, including identical time spans, some with a one-day variance during which the crimes were alleged to have occurred." Sanders contends that Amy never "specif[ied] the date of any of these incidents" or "estimate[d] the number of offenses." As a result, Sanders argues that although he "had notice that he was charged with multiple counts of sexual battery of a female child in violation of [Mississippi Code Annotated] section 97-3-95(1), . . . he had no way to defend against the repetitive counts."

¶23. Counts 1-8 of Sanders's indictment stated that during a one-year time frame for Counts 1 and 2, and during a four-month time frame for Counts 3-8, Sanders committed either digital penetration by inserting his fingers inside Amy's vagina or penile penetration by inserting his penis inside Amy's vagina. A review of both the evidence and relevant caselaw establishes that "the date is not of the essence of the offense" for these counts of sexual battery. *Ellzey v. State*, 412 So. 3d 358, 368 (¶15) (Miss. Ct. App. 2024) (internal quotation mark omitted). First, the parties raise no dispute that Amy was under the age of fourteen years old at the time provided in Counts 1-8 and that Sanders was twenty-four or more months older than her. *See id.*; s*ee also* Miss. Code Ann. § 97-3-95 (defining sexual battery). Second, as discussed below, we find that "the indictment fully and fairly informed [Sanders] of the charges against him . . . ." *Id.*

¶24. Similar to Sanders, the defendant in *Ellzey* argued that the time ranges provided in his indictment were too broad and lacked sufficient specificity. *Id.* at 367 (¶11). Ellzey's

12

indictment charged him with three separate counts of fondling over a five-year period between January 2009 and January 2014, while he was married to the minor victim's mother. *Id.* at n.4. Despite Ellzey's complaints about the broadness of the five-year date range, this Court noted that Ellzey's former stepdaughter "testified that the abuse happened so often and for so long that she could not remember specific dates." *Id.* at 368 (¶17). The only time-limiting evidence Ellzey's former stepdaughter could provide was that she knew the abuse had begun when she was about eight years old and had continued until she was around twelve years old, at which time her mother and Ellzey separated. *Id.* at 365-68 (¶¶2, 17). Taking into consideration both the minor victim's age at the time of the abuse as well as the constantly recurring nature of the abuse, this Court concluded that the five-year time frame provided in Ellzey's indictment, "while broad, was reasonable and narrow enough under the circumstances to fully and fairly inform Ellzey of the charges against him." *Id.* at 368 (¶17).

¶25.     This Court has reached a similar holding in other cases. In *Bradshaw*, 371 So. 3d at 826 (¶1), the defendant appealed from his conviction and sentence for sexual battery. Bradshaw argued that the three-and-a-half-year time frame given in his indictment was overly broad and failed to provide him with sufficient notice to adequately defend against the charge. *Id.* at 829-30 (¶18). This Court held, however, that Bradshaw's indictment "was crafted specifically to fit with the victim's testimony available at the time of the indictment, and no testimony or evidence came to light before the trial that could have narrowed the timeframe any more than it was." *Id.* at 832 (¶26). We noted that the minor victim was

13

under the age of fourteen when the abuse began, and although she could not recall specific dates for when the abuse occurred, she knew the days of the week on which the abuse had taken place. *Id.* at 833 (¶28). We further noted that the sexual abuse was of a prolonged and recurring nature and was committed by someone who had ready access to the minor victim. *Id.* at (¶29). Given "the nature of the case and the inability of the State to further narrow the timeframe listed in the indictment," we concluded that Bradshaw's indictment had "clearly apprised" him "of the nature and cause of the charge against him." *Id.*

¶26. Like the victims in *Ellzey* and *Bradshaw*, Amy testified that Sanders's abuse started when she was young and then occurred regularly over a period of several years. Specifically, Amy stated that the abuse began in 2012, when she was about eleven years old. She recounted at least two specific incidents of sexual abuse that happened during the dates provided in Counts 1 and 2. For example, Amy testified that her first sexual encounter with Sanders occurred on his living room couch when she was around eleven years old. Amy stated that during the first incident, Sanders penetrated her with both his fingers and his penis. Amy testified that the second incident of abuse also occurred when she was around eleven years old. According to Amy, Sanders drove her to Lincoln Lake and had sex with her in the back seat of a car.

¶27. Relevant to Counts 3-8 of Sanders's indictment, Amy testified that after Sanders began sexually abusing her in 2012, the abuse occurred almost every weekend for about the next eight years. Despite this expansive time period encompassed by Amy's testimony, the

14

State limited the dates contained in Counts 3-8 to focus only on a four-month period from the beginning of January 2013 through the end of April 2013. Given the particular facts and circumstances of this case, we find that the State tailored the time frames identified in Counts 1-8 as much as was "reasonable and narrow enough" based upon the available testimony and evidence. *Ellzey*, 412 So. 3d at 368 (¶17). We also conclude in light of established precedent such as *Ellzey* and *Bradshaw* that the narrowed date ranges in Counts 1-8 fully informed Sanders of the charges against him and afforded him the opportunity to present a meaningful defense to those charges. As a result, we conclude Counts 1-8 of Sanders's indictment are sufficient.

### B. Counts 9 through 12

¶28. On appeal, Sanders alleges that the indictment was defective as to Counts 9-12 for two reasons. First, the date range given in Counts 9-12 included Amy's eighteenth birthday. Because section 97-3-95(2) requires the sexual-battery victim to be under the age of eighteen, Sanders contends that these counts "failed to charge a crime cognizable" under Mississippi statutory law. Second, Sanders asserts that Amy's trial testimony failed to specify the exact date of the crimes alleged in Counts 9-12, and therefore, like Counts 1-8, these final four counts also failed to provide him with a "a plain, concise and definite written statement of the essential facts and elements constituting the offense charged" and sufficiently notify him "of the nature and cause of the accusation." MRCrP 14.1(a)(1).

¶29. Counts 9-12 stated that between December 22, 2019, and December 25, 2019, while

15

Amy was under the age of eighteen years old and Sanders was a minister in a position of trust and authority over Amy, Sanders committed digital penetration by inserting his fingers inside Amy's vagina, committed penile penetration by inserting his penis inside Amy's vagina, performed cunnilingus on Amy, and forced Amy to perform fellatio on him. The language provided in Counts 9-12 encompassed a period of days at the end of December 2019 when Amy was seventeen years old. These dates reflected the evidence that Amy provided both to Boyd before trial and during her testimony at trial. Amy clearly stated that the events described in Counts 9-12 occurred just before her eighteenth birthday when she and Sanders were at his home inside his bedroom. Based on the record evidence, we find that the State properly charged Sanders in Counts 9-12 with sexual battery of a minor under section 97-3-95(2). Moreover, despite Sanders's assertions to the contrary, we find that Counts 9-12 of his indictment also "furnish[ed him] with notice and a reasonable description of the charges against him so that he [might] prepare his defense." *Carr*, 422 So. 3d at 1034 (¶45) (quoting *Goff*, 14 So. 3d at 665 (¶175)). We therefore conclude that Sanders's indictment with regard to Counts 9-12 is sufficient.

## II.    Double Jeopardy

¶30.    Relying on *Goforth v. State*, 70 So. 3d 174 (Miss. 2011), Sanders next argues that the indictment's lack of specificity could impede his ability to claim double jeopardy in future prosecutions if he were ever re-indicted for the same offenses. We acknowledge that "an indictment must allege 'sufficient facts to enable the defendant to plead double jeopardy in

16

the event of a future prosecution for the same offense.'" *Nelson v. State*, 422 So. 3d 1035, 1040 (¶14) (Miss. Ct. App. 2025) (quoting *Gilmer v. State*, 955 So. 2d 829, 836-37 (¶34) (Miss. 2007)). We review Sanders's claims of double jeopardy de novo. *Jones v. State*, 428 So. 3d 453, 456-57 (¶10) (Miss. Ct. App. 2026).

¶31. In *Anderson v. State*, 293 So. 3d 279, 289 (¶26) (Miss. Ct. App. 2019), this Court addressed an almost identical argument. Anderson's indictment charged him with seven counts of touching a child for lustful purposes. *Id.* Each count of Anderson's indictment contained the same charging language but encompassed a time period that varied slightly from those provided in the other counts. *Id.* Similarly to Sanders, Anderson relied on *Goforth* in arguing "that the lack of specific dates in the indictment prohibit[ed] him from claiming double jeopardy in a subsequent prosecution for the same offense." *Id.* at 290 (¶30). In concluding that Anderson's claims of "future double jeopardy" lacked merit, this Court stated the following:

> In *Goforth* the indictment contained five *identically[]worded* counts of sexual battery and the defendant was convicted of some of the identical counts, but acquitted of the others. Under these circumstances, the supreme court found that double jeopardy prohibited retrial on any of the counts, recognizing that if the defendant were retried, neither she nor anyone else would be able to determine on which specific charges she previously was acquitted or convicted.
>
> In Anderson's case, however, he was not acquitted on any of the counts against him, and, in any event, the counts were not identical. As we note above, each count was identified by separate time frames. As such, Anderson cannot be prosecuted again for the same offenses against [the victim] occurring in George County during the June 1, 2010 to July 31, 2012 dates described in his indictment. Anderson could claim double jeopardy should this

17

occur.

*Id.* at 290-91 (¶¶30-31) (citations and internal quotation mark omitted).

¶32. As in *Anderson*, each count in Sanders's indictment was not identically worded, and each contained a slightly varied time frame from that identified in other counts. *Id.* at 291 (¶31). Moreover, as also occurred in *Anderson*, Sanders was not acquitted of any of the indicted charges against him. *Id.* Thus, we likewise conclude that Sanders "cannot be prosecuted for the same offenses against [Amy] occurring in [Lincoln] County during the [date ranges] described in his indictment[,]" and should this occur, Sanders could then assert a claim of double jeopardy. *Id.* For these reasons, we find that Sanders's claims of potential double jeopardy in future prosecutions lack merit here.

### III. Weight of the Evidence

¶33. Sanders also contends that his convictions of sexual battery were against the overwhelming weight of the evidence. We review for "abuse of discretion" the circuit court's denial of a new trial based on Sanders's "[c]hallenges to the weight of the evidence" supporting the jury's verdict. *Davis v. State*, 429 So. 3d 950, 958 (¶33) (Miss. Ct. App. 2026). "[W]e view the evidence in the light most favorable to the verdict, and the jury's verdict will be overturned 'only when it is so contrary to the evidence presented that to let it stand would sanction an unconscionable injustice.'" *Id.* (quoting *Hawkins v. State*, 410 So. 3d 462, 468 (¶19) (Miss. 2025)).

¶34. Sanders argues that no physical evidence or other trial testimony supported Amy's

18

allegations of sexual abuse. As he acknowledges in his appellate brief, however, Mississippi caselaw establishes "that the unsupported word of the victim of a sex crime is sufficient to support a guilty verdict where that testimony is not discredited or contradicted by other credible evidence." *Adame v. State*, 401 So. 3d 204, 208 (¶26) (Miss. Ct. App. 2025) (citation and internal quotation mark omitted). According to Sanders, though, Amy had a motive to fabricate her accusations against him because she not only disliked the rules he put in place, but she was also upset when he refused to give her more spending money.

¶35. Sanders's arguments regarding Amy's motives to fabricate the allegations against him are "precisely the sort of credibility call that is left to the jury, not this Court." *Hatchett v. State*, 420 So. 3d 926, 930 (¶20) (Miss. Ct. App. 2025). "This Court is 'particularly mindful that we do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury.'" *Varnado v. State*, 427 So. 3d 875, 884 (¶36) (Miss. Ct. App. 2025) (quoting *Follett v. State*, 380 So. 3d 961, 973 (¶45) (Miss. Ct. App. 2024)).

¶36. Here, the jury heard Amy's testimony providing details about the general pattern of sexual abuse Sanders inflicted on her over the span of many years. Amy also provided the jury with a detailed account of several specific incidents of sexual abuse. Although Sanders's wife, Valerye, stated that she never specifically heard or saw anything to indicate that Sanders was sexually abusing Amy, Valerye corroborated Amy's testimony that Amy's mother took Amy to the Sanderses' home on Friday evenings so Amy and Sanders could talk

19

alone in his bedroom. Valerye also corroborated Amy's testimony that these visits happened on a weekly basis and that Amy would sometimes stay overnight. In addition to Valerye's testimony, Boyd stated that he interviewed Amy on three separate occasions during his fifteen-month investigation into her accusations against Sanders. As the jury heard, Boyd testified that Amy's version of events remained consistent throughout their interviews.

¶37. The State also played for the jury Amy's recording of a conversation she had with Sanders. The recorded conversation provided further support for Amy's testimony that she had to go to Sanders's home on Friday nights to receive "counseling" from him. During the conversation, Sanders referenced Amy's "sexual appetite" and alleged that Amy had previously gotten pregnant after having sex with her brother. When Amy told Sanders that she did not want to have sex with him, Sanders disagreed and told her that she did want to have sex with him.

¶38. After hearing the trial evidence, including Sanders's denial of the charges against him and Amy's alleged motives for fabricating the charges, the jury still found Sanders guilty of all twelve counts of sexual battery. Upon review, we do not find that the jury's verdict was "so contrary to the evidence" that to allow the verdict to "stand would sanction an unconscionable injustice." *Davis*, 429 So. 3d at 958 (¶33) (quoting *Hawkins*, 410 So. 3d at 468 (¶19)).

## CONCLUSION

¶39. Because we find no reversible error, we affirm Sanders's convictions and sentences

20

for all twelve counts of sexual battery.

¶40.    **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND LASSITTER ST. PÉ, JJ., CONCUR.   WILSON, P.J., AND EMFINGER, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**